FILED: 8/23/2021 8:01 AM
David Trantham
Denton County District Clerk
By: Elizabeth Jones, Deputy

# STATE OF TEXAS – DENTON COUNTY COURTS

## 431ˢᵗ Judicial District Court

| | |
|---|---|
| Mr. Michael Moates, | Case No.: 21-6407-431 |
| DC Chronicle Limited, | |
| DC Chronicle (sole proprietorship – for profit) | **Amended Petition** |
|        Plaintiffs | **Jury Trial Demanded** |
|      v. | |
| Facebook Inc, | |
| AT&T Inc. | |
| Defendants | |

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff, Michael Moates, Pro Se, and files this Amended Petition, complaining against Facebook Inc (Referred to as Defendant), and AT&T Inc. (Referred to as 2ⁿᵈ Defendant) and in support thereof would respectfully show the court as follows:

## I. PARTIES

1. Plaintiff Michael Moates is an individual who resides in Denton County, Texas.

2. Plaintiff DC Chronicle Limited is a non-profit corporation in the State of Texas.

3. Plaintiff DC Chronicle is an unincorporated sole proctorship in the State of Texas.

- 1 -



**Exhibit**

**9**

4. Defendant Facebook, Inc. is a corporation and social media. Facebook, Inc. may be served through their registered agent at Corporation Service Company 211 E. 7th Street, Suite 620, Austin, Texas 78701.

5. Defendant AT&T, Inc.  is a corporation and mobile phone and service provider. AT&T may be served at CT Corporation System 1999 Bryan St, Ste 900, Dallas, TX 75201.

## VII. DEMAND TO PRESERVE EVIDENCE

6. Plaintiff demands that all Defendants preserve all evidence that is or may be relevant to the claims and defenses of the allegations made in this complaint including all electronic data of any kind.

## VIII. REQUEST FOR DISCLOSURE

7. Plaintiff requests that defendants disclose the information and material described in Texas Rule of Civil Procedure 194.2 within the time required by the rule.

## IX. DISCOVERY

8. Discovery Level 3 of Texas Rules of Civil Procedure applies to this Petition.

## II. JURISDICTION AND VENUE

9. The damages sought in this case exceed the minimal jurisdictional limits of the Denton County Judicial Courts.

10. Venue is proper in Denton County, Texas, because a) this is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred and b) it is in the county in which the plaintiff resided at the time of the accrual of the cause of action. Tex. Civ. Prac. & Rem. Code § 15.002.

11. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff is seeking relief over $200.

12. The federal courts do not have jurisdiction.

## III. JURY DEMAND

1. Plaintiff demands a trial by jury.

## IV. FACTUAL SUMMARY

2. Since August 29th, the Plaintiff has invested $10,546 (Exhibit A) on advertising with Facebook Inc. to build a following through likes, followers, and engagement on multiple of his pages that allow him to earn income via engagement of posts. Reach is determined by number of followers and likes. When someone spends money to build an audience they invest, and that money is returned through different types of engagements. In this case, the Plaintiff used the Facebook ad system for their Engagement ads.

2. According to their website, the description of these types of ads is "Get more people to follow your Page or engage with your posts through comments, shares and likes. You can also choose to optimize for more event responses or offer claims. It's important to note that the Plaintiff alleges that the word your implies that he retains ownership of the page that he is investing in. Dictonary.com defines "your" as one's (used to indicate that one belonging to oneself or to any person3) The Plaintiff asserts that he retains ownership of these pages and Facebook is simply a host for these pages. All data, followers, engagement, etc. belongs to the Plaintiff. It's important to note that Facebook is not a free service. You pay for their service in multiple ways. 1) You pay when they use your data for ads. 2) You pay for the right to have an audience when you run ads that build your page following and subscribers. But they often use data they were not entitled to.

4. On October 7th, 2020, the Plaintiff received an email message and notification on the Facebook website stating that he was not following community standards (See Exhibit B). The

Plaintiff, unsure of what he did wrong immediately reached out to Facebook Support. Facebook

Support responded that his page was in good standing, (See Exhibit C) acknowledged that this

may have cause confusion for the Plaintiff and instructed him have this reported as a bug.

Plaintiff asks the court to note that he does not have access to the email he sent to Facebook

support as it was sent using their internal systems and Facebook Inc. has blocked the Plaintiff

from access to retrieve anything from his account. The Plaintiff will request this as a part of

discovery as it goes to his defense. The Plaintiff also wants the court to recognize that he did file

it as a bug as they instructed him, but they never fixed the problem. This was one of the many

inaccurate statements made by Facebook during this process.

5. On October 20, 2020, the Defendant disabled access to the Plaintiffs Facebook (See

Exhibit D) (which included access to Messages, Profile Data, Groups, Pages and More) and

Facebook Business Manager Account (which included Creator Studio, Pages, and Ads). This

was done without any notification or explanation and the Plaintiff was made aware when he

attempted to access his account, he saw a message that read for more information, or if you think

your account was disabled by mistake, please visit the Help Center, on Facebook (See

Exhibit D).

6. Shortly thereafter, the Plaintiffs Instagram was disabled (which included all photos,

videos, messages, and stories), and a message appeared, Thanks for Providing Your Info. We'll

review your info and if we can confirm it, you'll be able to request a review in the Help Center

within approximately 24 hours, on Instagram (See Exhibit E).

7. Subsequently, the Plaintiff was unable to access his Oculus, Crowd Tangle, and

Messenger accounts due to Facebook disabling Facebook login. Facebook login is a feature that

allows you to use your Facebook account to login into 3rd party apps and websites.

- 4 -



8. After all of this took place on October 20th, 2020, the Plaintiff reached out to Carolyn

Everson (Vice President, Facebook) who said she So sorry this happened" and hoping for

some resolution. She included two of her staff members Meghan Orbe and Conrad Gibson on

her email. Conrad responded very quickly asking for some details and said, I ll be in touch once

I have an update from the account team." Conrad responded two days later stating "Apologies

for the delay as I worked with our team on your request. I heard back this morning and it seems

that your accounts were disabled permanently and, due to policy guidelines, they are unable to

share why the accounts were deactivated. I am so sorry this happened to you. I asked for more

information, but they were unable to share with me. I wish I could give you a better explanation,

but unfortunately, we have these rules in place to protect a user's privacy. I know that you had a

lot of photos saved to your accounts that you wanted to access. They provided me with the

following information on how to request data from a closed account. The links Conrad provide

were broken and did not work. (See Exhibits E) The Plaintiff subsequently reached out

and was given a new link. Upon filling out the request in the new link for his data Facebook said,

The Facebook account associated with the email address you provided to us has been disabled

for violation of our Terms of Service. (See Exhibit G) They did not provide the data they admit

belongs to him. There are a couple of important notes here. They claim the Plaintiff violated their

Terms of Service but previously in writing stated that it was a bug and Facebook accepted

responsibility for a mistake by acknowledging the confusion they caused and when Vice

President Carolyn Everson said she was so sorry this happened. The apology above is clearly

an admission of guilt. Especially when she says she is working on a resolution. That in itself

shows Facebook made a mistake and is working to rectify it but never does.

9. After getting no resolution from Carolyn Everson and her team, on October 23, 2020,

- 5 -



the Plaintiff reached out to Fidji Simo (Head of Facebook, Facebook Inc.). He explained the situation again and she said, I want to look into why that happened" and again her colleague would follow up Priya will follow up. Priya emailed that same day saying, Will have some more info shortly - thanks for your patience here! To date, she has never followed up with the Plaintiff. (See Exhibit H) This was again another misleading statement by Facebook where they made a commitment in writing to the Plaintiff but did not follow through.

10. The Plaintiff reached out to Facebook to see why his account was disabled. Many individuals said that they could not tell him why due to privacy reasons. However, one individual, Lisa-Bart Dolan (Politics and Government Outreach Associate Manager) finally said why the Plaintiff was blocked. She said we will remove any Facebook Pages, Groups and Instagram accounts representing QAnon, even if they contain no violent content. This is an update from the initial policy in August that removed Pages, Groups and Instagram accounts associated with QAnon when they discussed potential violence while imposing a series of restrictions to limit the reach of other Pages, Groups and Instagram accounts associated with the movement. Pages, Groups and Instagram accounts that represent an identified Militarized Social Movement is already prohibited. And we will continue to disable the profiles of admins who manage Pages and Groups removed for violating this policy, as we began doing in August. You can read more about this policy here: https://about.fb.eom/news/2020/08/addressin - movementsand-or anizations-tied-to-violence/ See Exhibit Q. This was not a policy the plaintiff was notified of or consented to. The Plaintiff had a page titled QAnon that had no QAnon content on it and was inactive. This seems to be an update to their Community Standards which is part of their Terms of Service. The Plaintiff takes issue with multiple parts of this starting with the fact that they have a duty to notify anyone when they change contractual agreements, which



1   they did not. See Douglas v Talk America, Harris v Blockbuster, Inc, and Rodman v Safeway.

2   The second issue here is in the initial statement by Facebook they stated Pages, Groups and

3   Instagram accounts associated with these movements and organizations will be removed when

4   they discuss potential violence. Two issues with this statement, first they disabled his accounts

5   across all platforms even though it doesn't say the entire Facebook account or any other accounts

6   except for Instagram accounts that include this kind of content which is the not. Second, the page

7   that he ran was in active and had not a single piece of violent content on it. This statement was

8   released by Facebook on 19 August 2020.

9   11. "Pages and Groups for QAnon containing discussions of potential violence and over 6,500

10  Pages and Groups tied to more than 300 Militarized Social Movements. But we believe these

11  efforts need to be strengthened when addressing QAnon. Starting today, we will remove any

12  Facebook Pages, Groups and Instagram accounts representing QAnon, even if they contain no

13  violent content." This is an update from the initial policy in August that "removed Pages, Groups

14  and Instagram accounts associated with QAnon when they discussed potential violence while

15  imposing a series of restrictions to limit the reach of other Pages, Groups and Instagram accounts

16  associated with the movement. Pages, Groups and Instagram accounts that represent an identified

17  Militarized Social Movement are already prohibited. And we will continue to disable the profiles

18  of admins who manage Pages and Groups removed for violating this policy, as we began doing

19  in August. Again, it is important to note that they said they were removing Pages, Groups and

20  Instagram accounts associated with the movement in August but never said anything about we

21  will continue to disable the profiles of admins who manage Pages and Groups removed for

22  violating this policy, as we began doing in August." They also admit they were removing pages

23  even if "contain no violent content" this was a violation of the terms of service the Plaintiff

24

25

26

27

28



signed with Facebook in 2014. According to the Facebook Community Standards in 2013 (the only contract the Plaintiff signed), there were only 11 items that violated the community standards. These were violence and threats, self-harm, bullying and harassment, hate speech, graphic content, nudity, identity and privacy, intellectual property, regulated goods, phishing and spam, and security[1]. Simply having a page titled Qanon, that "contain no violent content" is not a violation of these standards.

12. The Plaintiff also asks the court to note that in mid-October he attempted to delete the Qanon page to follow Facebook policy. He did this in good faith after becoming aware of the Policy through the news. Facebook to date never notified him. Facebook has a safeguard in place that requires you to wait 14 days before you can delete a Facebook page. See Exhibit R. Realistically, Facebook has this policy so they can profit off your data for 14 extra days.  So, the Plaintiff ultimately had his account disabled even though he was attempting to comply with their policies. It's important to know he was not required as he was not notified, nor did he consent. This is Facebook unilaterally changing a contractual agreement without notifying the parties of the agreement. They then seek to hold the parties accountable to their new requirements even though they never previously notified, nor did they give time for the Plaintiff to follow new said terms. It's also important to note that the policy seems to only apply to individuals Facebook seeks to target. Keep in mind that none of the content on this page was related to QAnon. In fact, the majority of news outlets that covered the story had more information about this conspiracy theory than the page that caused the Plaintiffs account to be disabled.

13. Less than a month and a half after initial Facebook ads were bought to invest in a business page following and audience Facebook disabled the account after making over $10,000

---

[1] https://web.archive.org/web/20140731125531/https://www.facebook.com/communitystandards/

from the Plaintiff. Again, it is important to note that Facebook engaged in a business transaction in which they sold advertising to build a following on multiple pages owned by the Plaintiff. Then they took the Plaintiffs access to pages owned by him. They have not refunded the Plaintiff, in fact they continued to charge him after stealing pages belonging to him.

14. The week before Facebook disabled the account, they charged the Plaintiff $5,137 for an audience they took away less than 6 days later. Again, pages belonging to the Plaintiff. (See Exhibit I) As stated in this complaint, Facebook acknowledge the pages belong to the Plaintiff.

15. The Defendant have a history of disabling accounts without any explanation. (See citations below) It is the belief of many that Facebook changed its policies days before the election and that is why many of the accounts were disabled. Facebook has not admitted this, however, it is important to note that the Plaintiff did not agree to any such rules or changes to any contractual agreements.

16. The Defendant has not shown that the Plaintiff violated any rules on each platform that he was banned from. In fact, they have stated multiple times that they really can't say why his account was disabled. They claim that he is a threat to their platform but have not provided any evidence to support this. Their actions are in bad faith. For example, the citizen journalism organization Project Veritas was able to uncover that that content moderators remove people without cause based on political view in bad faith. In one video a content moderator can be seen saying "If someone is wearing a MAGA hat, I am going to delete them for terrorism.[2]" This is clearly bad faith. It is also important to note that the Plaintiff alleges Mark Zuckerberg committed perjury before the United States Congress when he said, "none of the changes we

---

[2] https://www.projectveritas.com/news/facebook-content-moderator-ifsomeone-is-wearing-a-maga-hat-i-am-going-to/

- 9 -



make are target in any kind of biased way." Yet here you have someone blocking for wearing a hat.

17. Another example of this, would be when the Plaintiff would get messages such as telling him to kill himself and he would report it to Facebook, and they would not act on these reports. They would say it is not against their community standards. This shows bad faith. Especially since these kinds of messages are against the law. Had the Plaintiff acted on these statements the individuals who sent them could be prosecuted. See Commonwealth v Michelle Carter. She argued that she had the right to free speech and the Supreme Court left in place the Massachusetts Supreme Court ruling that she did not.

26. The final example of acting in bad faith is when Mark Zuckerberg said this to his friend in regard to user data[3]:

> Zuckerberg: Yeah so if you ever need info about anyone at Harvard
>
> Zuckerberg: Just ask.
>
> Zuckerberg: I have over 4,000 emails, pictures, addresses, SNS
>
> [Redacted Friend's Name]: What? How'd you manage that one?
>
> Zuckerberg: People just submitted it.
>
> Zuckerberg: I don't know why.
>
> Zuckerberg: They "trust me"
>
> Zuckerberg: Dumb fucks.

Clearly, Mark Zuckerberg thinks the people who use the Facebook products are suckers, and he shows that he has no intentions of engaging in good faith or protecting the user data.

    A. For example, Facebook collected the content of Plaintiffs' messages without

---

[3] https://www.esquire.conn/uk/latest-news/a19490586/mark-zuckerbergcalled-people-who-handed-over-their-data-dumb-f/



his consent. The Plaintiff only found this out after looking at their current Terms of Service

which he is not bound by as he never consented nor received notification of. See Douglas v Talk,

Rodman v Safeway Inc., and Harris v Blockbuster.

America. It is important to note that much of the information sent on Facebook is information

that would be protected by HIPPA, FERPA, and many other privacy acts.

      B. Here is a list of items Facebook tracked without the Plaintiffs consent (Please

note this list only includes items that the Plaintiff is aware of:

           i. Information about his personal devices including (Hardware, Software

           Versions, Battery Level, Signal Strength, Storage, App, File names, etc.

           ii. Device ID's and Identifiers

           iii. Bluetooth, Wi-Fi, and other information

           iv. Transactions (Both on Facebook products and off) (They track the

           third-party transactions of the Plaintiff)

           v. Plaintiffs communications with 3rd parties

           vi. Information from third parties (Important to note that Facebook may

get information from advertisers, app developers, and publishers even when someone has not

consented to that information being released to Facebook)

      C. Facebook exposed millions of people s data including the Plaintiffs

information when it allowed for the release of information without consent to Cambridge

Analytica. This information included public profile access, page likes, date of birth, current city,

newsfeed, timeline, and messages. It was a harvesting scheme to create a profile on subjects from

which the data was stolen. It also put people in danger by giving someone their locations. Not

only did Facebook not protect users from this scheme when it had a failure to warn but it was



negligent by attempting to cover up the scheme. (Important to note that the 9th Circuit Court of Appeals held in Jane Doe No. 14 v Internet Brands, Inc that immunity for claims of negligence does not apply.) They also attempted to mislead the public and journalists about how bad the scheme was.

D. The Defendant allows individuals to track you using personally identifiable information and then use that information to display ads in front of you. See Exhibit N. They do not give you the ability to turn this off nor do they give you the ability to remove this information that was uploaded to their systems without your consent.

18. It's also important to note that when the plaintiff originally bought his Oculus Go device, he did so with the premise that you did not need to have a Facebook account and while he used his Facebook account to login at the time there was a way to set up an account completely separate from Facebook. They took this ability away thereby insuring that the Plaintiff could not use the device he paid for.

19. The Plaintiff has approached the Defendant to attempt to resolve these situations. The Defendant chose to mislead the plaintiff by saying they would respond with more information and work to seek a resolution and then began ignoring and blowing off the Plaintiff. Evidence will be introduced in court do support this claim.

A. In accordance with the Statement of Rights and Responsibilities, the Plaintiff attempted to contact Facebook to resolve this dispute directly. The terms regarding the Plaintiffs contract with the Defendant states If you have questions or complaints regarding our Data Use Policy or practices, please contact us by mail at 1601 Willow Road, Menlo Park, CA 94025 if you reside in the U.S. or Canada, or at Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland if you live outside the U.S. or Canada. Anyone may also contact us



through this help page28. He also attempted to contact them via the form in the agreement which is broken. See Exhibit J.

20. At this time, the Plaintiff seeks to advise the court of a grand jury subpoena issued by the Southern District of New York in response to a criminal investigation where the Plaintiff is a witness. (See Exhibit L, please note the Plaintiff has blurred out identifying information of the investigated parties but is happy to submit to the court and the Defendant under seal to protect the government s investigation) The dada of that Facebook holds is required in order for the Plaintiff to continue cooperating with the government. In addition, the information is vital to any potential defense on the part of the Plaintiff. Facebook says on their website regarding data Parties to litigation may satisfy party and non-party discovery requirements relating to their Facebook accounts by producing and authenticating the content of communications from their accounts and by using Facebook s "Download Your Information" tool, which is accessible through the Settings drop down menu. If a person cannot access their content, Facebook may, to the extent possible, attempt to restore access to deactivated accounts to allow the person to collect and produce their content. However, Facebook cannot restore account content that had been deleted. Facebook preserves account content only in response to a valid government request. Facebook has the ability to give the Plaintiff the data that they already admit belong to the Plaintiff but are refusing to do so. This tool is called Download Your Information.30" Your Information being the keyword.

21. Facebook is in breach of contract and violation of due process. According to rules set by Facebook, due process is required People using Facebook s services and Facebook itself may bring forward content for board review. The board will review and decide on content in accordance with Facebook's content policies and values. A couple of issues with this whole



process. Facebook disabled the account of the Plaintiff without allowing him to appeal in violation of their own public statements to Congress. Facebook admits that the Plaintiff has the right to appeal their decision in multiple forms.

22. This includes disputing the ruling with Facebook (which the Plaintiff did via email since he did not have access to the support panel anymore), and appealing to the Oversight Board (which the Plaintiff was not allowed to do although the policy was already in place when they disabled his account). The bylaws state the board will review cases where people disagree with the outcome of Facebook s decisions and have exhausted the appeals process with Facebook. They further state that all content is eligible for review except

23. The following types of content are not available for the board s review, unless reassessed in the future by Facebook:

- Content types: content posted through marketplace, fundraisers, Facebook dating, messages, and spam.
- Decision types: decisions made on reports involving intellectual property or pursuant to legal obligations.
- Services: content on WhatsApp, Messenger, Instagram Direct, and Oculus.
- Where the underlying content has already been blocked, following the receipt of a valid report of illegality, and not removed for a Community Standards violation;
- Where the underlying content is criminally unlawful in a jurisdiction with a connection to the content (such as the jurisdiction of the posting party and/or the reporting party) and where a board decision to allow the content on the platform could lead to criminal liability for Facebook, Facebook employees, the administration, or the board's members; or



- 14 -

• Where the underlying content is unlawful in a jurisdiction with a connection

to the content (such as the jurisdiction of the posting party and/or the reporting

party) and where a board decision to allow the content on the platform could lead

to adverse governmental action against Facebook, Facebook employees, the

administration, or the board's members.

24. Facebook admits that when you create a Facebook group it belongs to you. Again, this goes back to their statements that it is your group. The allow these groups to be active even after disabling the Plaintiffs account. See Exhibit M. They take away the ability for the Plaintiff to control his own groups. They allow others to continue using his groups.

25. Facebook pays third party fact checkers" to check viral misinformation. However, this is actually not what they do. To start, Facebook hires biased fact checkers to check what is sometimes conflicting information. For example, by looking up some of the sources you will see that they favor one side or the other. The Daily Caller s Check Your Fact and the Dispatch favor conservatives while Science Feedback and USA Today favor liberals.

26. If s important to note that Facebook is liable under the Lachman Act when it competes against newspapers on its platform. They use an algorithm to determine what stories are performing well and then they try to prove them wrong and promote their own self stories. It is important to note that Facebook pays for the fact checking service3435. Not only do they pay these companies to fact check but they then use techniques designed to shrink the reach of publishers by making their algorithm not show posts that they disagree with. The Plaintiff has seen the fact checkers admit were wrong, and it caused the reach of his posts to be cut. This information will come out in discovery. Nieman Lab reported company's fact checking partners



received between USD$850-$1790 per fact check in July 201937. Facebook is actively competing against publishers by employing these individuals to censor posts using their algorithm. They are actively conspiring and competing with publishers.

27. TX HB 4390 states (b) A person who conducts business in this state and owns or licenses computerized data that includes sensitive personal information shall disclose any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person. The disclosure shall be made without unreasonable delay and in each case not later than the 60th day after the date on which the person determines that the breach, except as provided by Subsection (d) or as necessary to determine the scope of the breach and restore the reasonable integrity of the data system. Facebook failed to protect the privacy of its users when it allowed millions of account data to be stolen. They violated state law by not informing the Plaintiff or those similarly situated within 90 days.

28. TEXAS BUSINESS AND COMMERCE CODE TITLE 2, CHAPTER 17 DECEPTIVE TRADE PRACTICES says, except as provided in Subsection (d) of this section, the term "False, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts: (9) advertising goods or services with intent not to sell them as advertised and (7) representing those goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Facebook acted illegally when they sold the oculus device and then rendering it useless based on the disabling of the users account and access to the device.



29. Facebook represented that Moates was banned under their Qanon policy[4]. Admitting they considered Moates to be a member of the Qanon movement. On a press release on 19 January 2021, they called members banned under this policy "Dangerous Individuals," "militarized social movements," and "violence-inducing conspiracy networks, such as Qanon." These statements are libelous. Furthermore, the boast "we also removed about 3,000 Pages, 9,800 groups, 420 events, 16,200 Facebook profiles, and 25,000 Instagram accounts for violating our policy against QAnon.[5]"

30. Plaintiff DC Chronicle was harmed because of the actions taken on Moates' account. The pages they used for their business model and to share news were disabled. The groups they used for their business model were disabled. Their access to Instagram and Crowdtangle were disabled.

31. Plaintiff DC Chronicle was harmed because of the actions taken on Moates' account. The analytical data on their news postings was stolen by Facebook when they disabled the account.

32. Plaintiff DC Chronicle was harmed because of the actions taken on Moates' account. All communications used by DC Chronicle were stolen by Facebook when they disabled the account.

## V. CAUSES OF ACTION AND ADDITIONAL FACTS

## CAUSES OF ACTION AGINST PLAINTIFF FACEBOOK

### A. DEFMATION OF CHARACTER – LIBEL (Texas CPR, Title 4, Chapter 73)

1. All previous allegations are incorporate herein by reference.

2. Mr. Moates is a private individual who does not hold public office nor is a public figure for any purpose.

---

[4] https://storage.courtlistener.com/recap/gov.uscourts.txed.202288/gov.uscourts.txed.202288.28.0.pdf
[5] https://about.fb.com/news/2020/08/addressing-movements-and-organizations-tied-to

3. The foregoing statements made and published by the Defendant were statements made of fact that were false, misleading, or lacked context.

4. The statements made by Defendant directly and indirectly referred to the Plaintiff.

5. The statements made by the Defendant were libelous per se because they have injured Mr. Moates reputation and exposed him to public hatred, contempt, ridicule, and financial injury.

6. The statements made by the Defendant were libelous per se because they injured Mr. Moates in his home, profession, and various occupations.

7. In the alternative, the foregoing statements made and published by the Defendant were libelous through innuendo and implication. The Defendant engaged in the omission of facts and context to frame their narrative. Since the Plaintiff was a former contributor, they had his email on file.

8. Defendant are strictly liable for damages caused by the libel.

9. Alternatively, Defendant knew the foregoing defamatory statements were false or reckless with regard to the accuracy of the statements.

10. Alternatively, Defendant knew or should have known the defamatory statements were false. In addition, they did not do their due diligence.

11. Mr. Moates is entitled to recover nominal damages, general damages, special damages, and exemplary damages.

**B. Breach of Contract – Material Misrepresentation of Fact, Material Breach (Texas Statutory and Common Law) Count One**

1. A legally binding contract was formed between Moates and the Defendant.

2. The offer was accepted by Moates.

- 18 -



3. This contract did not apply to DC Chronicle and to date DC Chronicle has not signed an agreement with the Defendant.

4. The contract is Statement of Rights and Responsibilities from 2014. Moates has not been notified or agreed to any new agreements. According to precedent set by the Supreme Court of the United States, no new terms can apply because Moates has not been notified nor accepted any subsequent agreements. See Douglas v Talk America Inc., Harris v Blockbuster, Inc, and Rodman v Safeway.

5. The Plaintiffs paid for services including but not limited to use of user data for advertising and to build a following by the Defendant, and monetary exchange.

6. Defendant breached their contract by not providing the platforms and disabling the user accounts without cause. By charging the Plaintiff for services not rendered. By enforcing a contract, the Plaintiff did not agree too.

7. The Plaintiffs were damaged monetarily, emotionally, and suffered a loss of important data, reach, and communications.

**C. Breach of Contract – Count Two**

1. The Defendant breached multiple contracts when they disabled all subsequent accounts including Instagram, Oculus, Crowdtangle, and Whatsapp.

2. The Defendant disabled multiple accounts in violation of the Statement of Rights and Responsibilities. The Statement of Rights and Responsibilities does not have any prevision for the deactivation of Instagram, Oculus, Whatsapp, and Crowdtangle accounts. Furthermore, they deactivated the Facebook account without cause. The contract states "If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you." The Defendant did no such thing. Simply having a



non-violent page titled Qanon is not legal exposure because any claims brought by the government for simply titling a page Qanon would be protected by the First Amendment.

**D. Breach of Contract – Count Three**

1. The Defendant breached a contract by making the false representation that "you own all the content and information you post on Facebook." If that is the case why is Facebook holding the Plaintiffs data hostage and not releasing what they admit belongs to the Plaintiffs[6].

**E. Breach of Contract – Count Four**

1. The Defendants breached a contract by promising to "provide you with seven days' notice and an opportunity to comment on changes to this statement." That did not happen.

**F. Breach of Contract – Count Five**

1. Facebook agreed to "You may also delete your account or disable your application at any time." Again, this is not true. They do not give you the ability to delete your account if they disable it.

**G. Texas Deceptive Trade Practices Act – Count One**

1. The Plaintiffs were a consumer of the Defendant.

2. The Defendant advertised goods or services with intent not to sell them as advertised. This included selling ads for the pages, selling the Oculus and then rendering it useless, and promising services not provided. This also includes accepting payment of the Plaintiffs data but then not providing the payment of service to them. The Defendant made and continue to make false claims while trying to sell their products including but not limited to stating that they are "your pages," "your groups," and "you can download your data at any time." The Defendant charged the Plaintiff thousands of dollars in the weeks leading up to his disabled account and they

---

[6] https://storage.courtlistener.com/recap/gov.uscourts.txed.202288/gov.uscourts.txed.202288-28-2.pdf

represented he would build a following this way. This was a lie intended to mislead him into their scam of taking money.

3. The Defendant promoted a pyramid promotional scheme, as defined by Section 17.461. The statute says, "A person commits an offense if the person contrives, prepares, establishes, operates, **advertises**, sells, or **promotes a pyramid promotional scheme**." Facebook approved advertising and continues[7] to advertise and promote Advocare. The FTC determined that Advocare was a pyramid scheme and Advocare admitted and settled[8].

4. The Defendant knew at the time that the Plaintiff was advertising that they planned to suspend his account, but they did not notify him. Instead, they continued to bill him for a following they knew they were going to take away. The failure to disclose information concerning goods or services known at the time of the transaction and was used to induce the consumer into a transaction who otherwise would not have entered had the information been disclosed. It is clear the Plaintiffs would not have paid for a following they did not expect to keep. This was done with malice.

5. The Defendants mislead individuals by willingly changing the goals of advertisers without telling them or notifying them. They admit to "we may broaden the targeting criteria you specify.[9]"

**H. Texas Deceptive Trade Practices Act – Count Two BUSINESS AND COMMERCE CODE TITLE 2 CHAPTER 17.46 AND 17.50,**

---

[7] https://www.facebook.com/ads/library/?active_status=all&ad_type=all&country=US&view_all_page_id=258046150625&sort_data[direction]=desc&sort_data[mode]=relevancy_monthly_grouped&search_type=page&media_type=all
[8] https://www.ftc.gov/news-events/press-releases/2019/10/multi-level-marketer-advocare-will-pay-150-million-settle-ftc
[9] https://storage.courtlistener.com/recap/gov.uscourts.txed.202288/gov.uscourts.txed.202288.28.2.pdf

1. Defendant Facebook makes a statement in their Statement of Rights and Responsibility that says, "you own all of the content and information you post on Facebook."

2. Defendant Facebook has taken this data they claim Plaintiff Moates owns.

3. They are in violation of the law that states "disparaging the goods, services, or business of another by false or misleading representation of facts. They claim he owns content that is on their servers, yet they restrict his access to that content.

4. Furthermore, in an email from the Office of the Vice President for Global Business, they stated that he could "request data" that he owns. The also said "they'd be happy to assist."

5. Both statements were intentionally false, both statements were made to get Plaintiff Moates to act, by signing the Statement of Rights and Responsibilities or to fill out said non-existent form." Both caused significant emotional distress and interfered with business operations.

**I. Texas Deceptive Trade Practices Act – Count Three (Oculus Go) BUSINESS AND COMMERCE CODE TITLE 2 CHAPTER 17.46 AND 17.50**

1. Prior to the sale of the Oculus Go to Moates, Facebook/Oculus never stated that a Facebook account was needed. Nor could Mr. Moates have expected to need a Facebook account. In fact, they advertised using an Oculus account to access the device.

2. Facebook decided after that they were going to require that you use a Facebook account[10].

3. At no time was the Facebook account requirement an issue when the Oculus Go device was purchased.

4. The law states "DECEPTIVE TRADE PRACTICES UNLAWFUL. (a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared

---

[10] https://www.oculus.com/blog/a-single-way-to-log-into-oculus-and-unlock-social-features/

unlawful" and "disparaging the goods, services, or business of another by false or misleading representation of facts" is one of the unlawful acts.

5. By requiring the Facebook account after the sale and saying, "If you choose not to merge your accounts at that time, you can continue using your device, but full functionality will require a Facebook account," Facebook is disparaging the product. By saying you only needed and Oculus account to use the device at the time of sale and then changing it after the fact, Facebook made "false and misleading representation of facts."

6. Furthermore, by requiring the use of Facebook (the platform,) they are coercing you into a new contract to use a device you already purchased. They state that in order to have full functionality of your device, you must use Facebook and also say "when you log into Oculus using your Facebook account, Facebook will use information related to your use of VR and other Facebook products." Therefor I argue that this is you must agree to our contract or we are going to make your device limited.

**J. Texas Deceptive Trade Practices Act – Count Three (Oculus Quest) BUSINESS AND COMMERCE CODE TITLE 2 CHAPTER 17.46 AND 17.50**

1. Prior to the sale of the Oculus Quest 2 to Moates, Facebook nor any 3rd Party, relayed to Moates that he would need a Facebook account to use his Oculus Quest 2.

2. When Moates began to use his device, he realized that under the Terms, Facebook/Oculus stated that a Facebook account was needed.

3. So essentially, the device was sold and then Facebook required you to enter a contract that requires you to use Facebook to have a functional device. By selling, then forcing a contract to use the device, Facebook engaged in coercion of contract. They also violated the law which states they cannot "disparage [ing] the goods, services."



4. At the time of the sale, Mr. Moates had an active Facebook account and there was no reason to suspect Facebook was going to disable it.

**K. Texas Deceptive Trade Practices Act – Count Four Breach of Expressed Warranty (Oculus Quest and Go) BUSINESS AND COMMERCE CODE TITLE 2 CHAPTER 17.46, 17.50, 2.313, AND 2.314 – 2.315, AND TEXAS OCCUPATIONS CODE CH 1304**

1. Facebook offers a "Limited Consumer Warranty[11]" with the sale of the Oculus devices. It states, "This Warranty gives you specific legal rights, and you may also have other rights, which vary from state to state and country to country."

2. It also waives any forum selection clause stating, "This Warranty is in addition to, and does not affect any rights you have under the laws in your jurisdiction concerning the sale of consumer goods."

3. It says, "under normal and intended use, function substantially in accordance with our technical specifications or accompanying product documentation (the "Warranted Functionality") during the Warranty Period." And "If and to the extent the Product needs Facebook Technologies software or services to achieve the Warranted Functionality, we will make and keep software and services available during the Warranty Period. We may update, modify or limit such software and services in our sole discretion so long as we continue to maintain (or exceed) the Warranted Functionality."

4. Facebook has failed to do just that. They in fact took steps to make both devices inaccessible. They disabled the account, they misrepresented the functionality, they have not complied with the warranty after being given notice.

---

[11] https://scontent-dfw5-2.xx.fbcdn.net/v/t39.2365-6/49630950_615501395581577_8065528336517955584_n.pdf?_nc_cat=107&ccb=1-5&_nc_sid=ad8a9d&_nc_ohc=sRgKAe5htMQAX-3LJkh&_nc_ht=scontent-dfw5-2.xx&oh=b58e54abeb48f1e49f79ac54754d6415&oe=6125CCB0



5. Furthermore, the Oculus terms of service state that you must follow the Facebook Terms of Service… but it does not state which version of the terms. As Moates understands it, the Terms for Facebook when Moates signed up for Facebook apply because Moates has never received notice of a change of terms. See Douglas v Talk America, Harris v Blockbuster, and Rodman v Safeway. Furthermore, the link in the Oculus terms that states this is "facebook.com/terms/" the exact same URL as when Moates agreed to the Terms in 2014. See Pricer Declaration which states these are the "Terms" for your relationship with Facebook.

**L. Texas Deceptive Trade Practices Act – Count Four Negligence (Oculus Quest)**

1. When Facebook sold the device to Moates, they had a duty to make sure that the device and all components worked properly. Facebook had a duty to protect its users from unnecessary harm. The lack of Facebook to protect Moates cause Mr. Moates to have significant skin irritation, breakouts, and red skin around the base of the cover.

2. Facebook should have foreseen the issue because the device is used by directly touching the skin and using the eyes.

3. Furthermore, Mr. Moates attempted to resolve the issue, but he did not have access to the "Go to my device" section because Facebook disabled his account[12].

**M. Texas Deceptive Trade Practices Act – Count Five Breach of Express Warranty (Oculus Quest) BUSINESS AND COMMERCE CODE TITLE 2 CHAPTER 17.46, 17.50, 2.313, AND 2.314 – 2.315, AND TEXAS OCCUPATIONS CODE CH 1304**

1. When Facebook sold the device to Moates, they had a duty to make sure that the device and all components worked properly. Facebook had a duty to protect its users from unnecessary

---

[12] https://www.oculus.com/quest-2/removable-facial-interface-alert/



harm. The lack of Facebook to protect Moates cause Mr. Moates to have significant skin irritation, breakouts, and dark red skin around the base of the cover.

2. Furthermore, Mr. Moates attempted to resolve the issue, but he did not have access to the "Go to my device" section because Facebook disabled his account[13]. Facebook by disabling his account removed Moates' ability to file a warranty claim.

3. The warranty states "This Warranty covers defects and malfunctions in the new Facebook Technologies product(s) it accompanies (the "Product")."

**N. Product Liability – Design Defect (Oculus Quest) CPRC TITLE 4 CHAPTER 82**

1. The Quest 2 was defectively designed and unreasonably dangerous. According to the Consumer Product Safety Commission, "the foam interface," "attached to the Oculus Quest 2 headset," can cause facial problems including "including rashes, swelling, burning, itching, hives, and bumps."

2. The device again caused significant skin irritation, breakouts, and red skin around the base of the cover.

3. Many safer alternatives existed including the replacement product Silicon Facebook now sends to those who don't have their Facebook account disabled.

**O. Product Liability – Manufacturing Defect (Oculus Quest) CPRC TITLE 4 CHAPTER 82**

1. The Quest 2 was defectively designed.

2. The device again caused significant skin irritation, breakouts, and red skin around the base of the cover.

**Product Liability (Quest) Breach of Implied Warranty of Merchantability**

---

[13] https://www.oculus.com/quest-2/removable-facial-interface-alert/



1. Facebook sold the Product to Moates.

2. It was unfit for ordinary purposes.

3. The Plaintiff blocked access to file a claim by disabling his access to the Go To My Device section of Oculus Facebook. When the Plaintiff reached out to the company via chat they continued to refer him back to the Go to My Device portal.

4. The product defect caused Mr. Moates to have significant skin irritation, breakouts, and dark red skin around the base of the cover.

**P. Product Liability (Quest) Fraud By Non-Disclosure**

1. Facebook attempted to hide how dangerous the recall was. They claimed, "very small percentage of users who have experienced skin irritation.[14]" When what they should have said is approximately 4 million devices have significant health risk that can cause "facial skin irritation and reactions including rashes, swelling, burning, itching, hives, and bumps.[15]"

2. These facts were material and not disclosed. Facebook had a duty to keep consumers safe and instead of making accurate statements they downplayed the seriousness of health risk so they could profit and have to spend less on replacements.

3. Facebook knew that the plaintiff was ignorant of the facts, and the plaintiff did not have an equal opportunity to discover the facts. He did not have access to the information because Facebook keeps the information private.

4. Facebook intended to downplay it and cause others to refrain from acting by failing to disclose the facts and by misrepresenting the facts. What they call "skin irritation" is actually "burning, hives," etc

---

[14] https://www.oculus.com/quest-2/removable-facial-interface-alert/
[15] https://www.cpsc.gov/Recalls/2021/Facebook-Technologies-Recalls-Removable-Foam-Facial-Interfaces-for-Oculus-Quest-2-Virtual-Reality-Headsets-Due-to-Skin-Irritation-Hazard-Recall

**R. Aiding and Encouraging Suicide (PENAL § 22.08. Aiding Suicide)**

1.  Multiple Facebook users had told Plaintiff Moates to kill himself. Each time Moates reported these messages to Facebook and each time after Facebook staff reviewed the comments, they said that it was not against their terms and that no action would be taken. Thereby promoting the message sent by the users.

**S. Data/Cyber Security – (Tex. Bus. & Com. Code § 521.052(a))**

1. Facebook failed to take appropriate actions to protect the data of its users and as a result, the Plaintiffs data was exposed to unauthorized users during the Cambridge Analytica scandal.

2. Facebook failed to notify the public regarding the breach and attempted to cover up how bad it was in violation of the law, Sec 521.053[16]. Facebook accepted responsibility for the mistake, thereby making them liable[17].

3. In September 2018, Facebook again failed to take appropriate actions to protect the data of its users and as a result, the Plaintiffs data was exposed to unauthorized users in which they could see all the Plaintiffs private content. This was right after the Cambridge Analytica scandal.

4. Again, Facebook failed to notify the effected users.

5. In March 2019, Facebook was exposed for storing millions of user's passwords in plain-text files. Any of the thousands of Facebook employees had access to these passwords. This was extremely reckless[18].

6. It was subsequently exposed that Facebook did the same thing for millions of Instagram users[19].

---

[16] https://www.bbc.com/news/technology-56815478
[17] https://www.politico.com/story/2018/04/04/facebook-cambridge-analytica-data-users-502064
[18] https://krebsonsecurity.com/2019/03/facebook-stored-hundreds-of-millions-of-user-passwords-in-plain-text-for-years/
[19] https://techcrunch.com/2019/04/18/instagram-password-leak-millions/

7. Again, in both instances they did not notify affected users.

8. In two separate instances in April and September of 2019, Facebook information was exposed placing user information on a sever giving people access to users phone numbers, names, gender, and locations.

9. Again, in both instances they did not notify affected users[20].

10. In December of 2019, Facebook exposed 300 million users by giving hackers access to their API which allowed them to scrape phone numbers, names, and user ID's which were posted on the dark web[21]. Subsequent information about a second server came out in March 2020.

11. Again, in both instances they did not notify affected users.

12. Facebook failed in multiple instances to "implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by the business in the regular course of business" and to "A person who conducts business in this state and owns or licenses computerized data that includes sensitive personal information shall disclose any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person."

13. As alleged above, 2nd Defendants made information accessible to Facebook through the Plaintiffs cell phone including tracking internet browsing data, biometric data, health data, location data, financial data, phone usage data, search history, and identifiers.

**T. Biometric Data – (Tex. Bus. & Com. Code § 503.001)**

---

[20] https://www.technologyreview.com/2019/09/05/133154/facebook-has-leaked-419-million-phone-numbers/
[21] https://newyork.cbslocal.com/2019/12/20/facebook-dark-web-data-breach/

1. At no time has Facebook provide informed consent required for the collection of biometric identifiers as required by law.

2. Facebook ran a program called "Tag Suggestions' which works by scanning photographs uploaded by a user and then identifies faces appearing in those photographs. Tag Suggestions uses proprietary facial recognition software to extract from user-uploaded photographs the unique biometric identifiers (i.e., graphical representations of facial features, also known as facial geometry) associated with people's faces. Facebook did not disclose its biometrics data collection to its users, nor does it even ask users to acknowledge, let alone consent to, these practices

3. From 2015 forward, Instagram collects and stores biometric data of more than 100 million users, without their knowledge or consent. Facebook then uses the data to "bolster its facial recognition abilities across all of its products, including the Facebook application, and shares this information among various entities. Facebook does all of this without providing any of the required notices or disclosures required by Texas law.[22]"

4. At no time did the Plaintiff provide consent to AT&T to transmit said data to Facebook.

**U. Right to Adequate Assurance of Performance (Tex. Bus. & Com. Code § 2.06)**

1. Texas law requires "A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired." Defendant Facebook violated the law by impairing the Plaintiff (Moates) access to use the software/device through his Oculus Quest 2 and Oculus Go.

---

[22] https://www.thedailybeast.com/how-facebook-fights-to-stop-laws-on-facial-recognition

2. When Facebook disabled the accounts of Moates Facebook, Instagram, Crowdtangle, WhatsApp and Messenger, it violated the law by impairing the product to which Moates and DC Chronicle had a reasonable expectation of receiving.

**V. Fraud – Count One (Penal Code Title 37 Chapter 32)**

1. As the courts are aware, there are four elements to an allegation of fraud: (1) that a material representation was made; (2) that the representation was false; (3) when the statement was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act on it; (5) the party acted in reliance on the representation; and (6) the party suffered injury.

2. Jenny Pricer, a Facebook Case Manager in eDiscovery/Litigation Legal Department made a "declaration" under "penalty of perjury" that "Plaintiff Michael Moates created a Facebook account on July 13, 2014. Attached hereto as Exhibit A is a true and correct copy of the November 15, 2013, Terms of Service that was in effect in July 2014, as maintained in Facebook's records." For this courts notice, the declaration and exhibit are marked Exhibit S in this filing.

3. When Plaintiff Moates signed up for Facebook in "July 2014" he agreed to a Statement of Rights and Responsibilities and no subsequent agreements.

4. Mrs. Pricer made a material representation made under "penalty of perjury" to the court and to the Plaintiff. (He was served).

5. The Exhibit shows multiple hyperlinks in blue and underlined. But this was not the case when Plaintiff Moates signed up. The hyperlinks similarly as they appear today were black[23]. Also,

---

[23] https://www.facebook.com/legal/terms/update



they were also not underlined[24]. Plaintiff Moates had no way of knowing they were hyperlinks at the time and by representing the that they were blue and underlined, they made a factual misrepresentation.

6. Had Moates known at the time that these were hyperlinks, he would have reviewed them. Facebook intentionally did not make it know that these were separate agreements. This was done with malice.

7. Moates acted on the belief that the Statement of Rights and Responsibilities served as the contract between Moates and Defendant Facebook. Facebook acted with the intent to disguise the other agreements to get users to agree.

8. Moates relied on the fact that these "terms of service that governs our relationship with users and others who interact with Facebook. By using or accessing Facebook, you agree to this Statement" and that statement alone.

9. Plaintiff Moates has now suffered many different injuries, including monetary, the loss of accounts and data, litigation, litigation determinations, etc. This was intentional by the Defendant Facebook Inc.

10. The alteration of the document after executed by the Plaintiff with the intent "to alter, make, complete, execute, or authenticate any writing so that it purports: (i)  to be the act of another who did not authorize that act;" is the issue at hand here.

**Q. Fraud – Count Two (Penal Code Title 37 Chapter 32), Penal Code 32.46**

1. As stated above, "Jenny Pricer, a Facebook Case Manager in eDiscovery/Litigation Legal Department made a "declaration" under "penalty of perjury" that "Plaintiff Michael Moates created a Facebook account on July 13, 2014. Attached hereto as Exhibit A is a true and correct

---

[24] https://web.archive.org/web/20141014030338/Facebook.com/terms



copy of the November 15, 2013, Terms of Service that was in effect in July 2014, as maintained in Facebook's records." For this courts notice, the declaration and exhibit are marked Exhibit S in this filing."

2. When Plaintiff Moates signed up for Facebook in "July 2014" he agreed to a Statement of Rights and Responsibilities and no subsequent agreements.

3. Mrs. Pricer made a material representation made under "penalty of perjury" to the court and to the Plaintiff. (He was served).

4. These misrepresentations cause the Plaintiff to dismiss his claims in federal court and pursue only state claims.

5. The Exhibit shows multiple hyperlinks in blue and underlined. But this was not the case when Plaintiff Moates signed up.

6. By taking the declaration "under penalty of perjury," Moates made a calculated decision to proceed with state claims in state court only.  This was done with malice to get the court to rule one way and to get Moates to change his opinion of the facts.

7. Now, Plaintiff Moates has suffered injury by relying on these statements. Thus, now he would have to spend numerous hours on refiling with the federal court and start the process over.

**R. Fraud – Count Three (Penal Code 32.31)**

1. After disabling the Plaintiff Moates' account, Defendant Facebook attempted to charge both Moates and DC Chronicle (both entities)(through Moates) after having the right revoked in writing to their attorneys.

2. Please note the attorneys asked Moates not to communicate with Facebook only through them.

3. These charges were for services that they had not provided.



4. These charges were after the Plaintiffs requested in writing on 1 December 2020. They continued with malice. See Exhibit V.

5. These damages cause harm to the Plaintiffs relationship with his bank.

6. They also caused numerous stress and anxiety that because they had now cut his income and were attempting to continue to charge him, he may not have funds to live.

**S. Fraud – Count Four (Penal Code 32.32)**

1. During the purchase of advertising, Facebook represented to Plaintiffs that they could run ads "Create a promotion to help **more people find and like your page.**" See Exhibit T.

2. The statement was false as they did not provide the likes. Furthermore, Facebook took away likes and followers without cause. Likes are according to Facebook are "support for a Page and be able to see updates from it in News Feed.[25]" Finally, they did not share the content, or they severely limited the reach of the content in newsfeed. Thereby making misrepresentations about the advertising, reach, following, and likes.

3. Facebook made the misrepresentation with the idea to profit and knowingly knew the algorithm may not show content[26]. This was done with malice.

4. The Plaintiffs suffered injury.

**U. Fraud – Count Four (Penal Code 32.32)**

1. 1. During the purchase of advertising, Facebook represented to Plaintiffs that they could run ads "Create a promotion to help **more people find and like your page.**" See Exhibit T.

2. The statement was false as they did not provide the likes. Furthermore, Facebook took away likes and followers without cause. Likes are according to Facebook are "support for a Page and

---

[25] https://www.facebook.com/help/216630288356463
[26] https://about.fb.com/news/2019/02/inside-feed-facebook-26-friends-algorithm-

be able to see updates from it in News Feed.[27]" Finally, they did not share the content, or they severely limited the reach of the content in newsfeed. Thereby making misrepresentations about the advertising, reach, following, and likes.

3. Facebook made the misrepresentation with the idea to profit and knowingly knew the algorithm may not show content[28]. In addition, at no time told the Plaintiff his content would be diminished in reach based on their perception of what news is. In fact, in their agreement with Moates they state they will "enhance the effectiveness" of your ads.

4. When you purchase something you own it. The likes/followers were purchased. Facebook has now stolen the followers/likes from the Defendants.

5. That factor that the Plaintiffs were selling the following/reach to the Plaintiff was a key decision to purchase it. They continued selling to him knowing they planned to disable his accounts. They did this to profit. This was done with malice.

6. This was a direct damage to the Plaintiffs.

**V. Violation of the Texas Constitution Article 1.8**

1. The Texas Constitution states, "very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."

2. When Facebook disable the account of the Mr. Moates, they engaged in censorship. Furthermore, Facebook is a state actor and are not protected as a private entity. For example, Facebook entering a contract partnership with the Federal Government for the intention of providing services that are subject to various free speech laws[29][30]. Furthermore, Facebook

---

[27] https://www.facebook.com/help/216630288356463
[28] https://about.fb.com/news/2019/02/inside-feed-facebook-26-friends-algorithm-myth/
[29] https://www.archives.gov/files/social-media/terms-of-service/tos-facebook.pdf
[30] https://www.epic.org/foia/gov2.0/GSA_Facebook_Amendment.pdf



provides pages to various state and federal legislatures, courts, and the executive branches. They help the government run said pages and by doing so, they are acting in partnership and on behalf of the government. For example, Facebook acted on behalf of the government by creating accounts and transferring followers to Biden administration[31][32]. Another example, would be when Facebook acted on behalf of the National Archives by archiving previous administration pages.

3. When they disabled the account of Plaintiff Moates, they blocked his ability to communicate with government officials and they did so as a state actor.

**\*Nothing in this section is requesting claims on the federal lever, simply sharing facts for the Texas Constitutional claim\***

**W. Data Theft - Violation of Penal Code Title 7 Chapter 33.02 Breach of Computer Security Count 1**

1. Facebook violated the law which states "A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."

2. Facebook accessed information related to health and fitness, financial, browsing history, phone usage, purchases, location, contacts, search history, and other data without the consent of the Plaintiff.

3. Furthermore, Facebook used this information to profit thereby violating the law. "When benefits are obtained, a victim is defrauded or harmed, or property is altered, damaged, or deleted in violation of this section, whether or not in a single incident, the conduct may be

---

[31] https://www.axios.com/facebook-instagram-transfer-accounts-followers-biden-administration-629a4c33-22fc-43aa-96e3-60ef3d37ab62.html
[32] https://www.thedenverchannel.com/news/national-politics/twitter-facebook-will-transfer-white-house-accounts-to-biden-on-inauguration-day

considered as one offense and the value of the benefits obtained and of the losses incurred because of the fraud, harm, or alteration, damage, or deletion of property may be aggregated in determining the grade of the offense."

**X. Data Theft – Violation of Penal Code Title 7 Chapter 31.03 Theft Count 2**

1. The law states 'A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property."

2. In its agreement with Moates in 2014, Facebook maintained that "You own all of the content and information you post on Facebook" and by restricting access to the content Facebook has stolen said data (content)

3. Plaintiff Moates has suffered numerous damages including loss of access to school information, loss of access to business information, loss of access to messages, personal photos, and many other losses.

**CAUSES OF ACTION FOR AT&T**

**A. Fraud – Violation of Penal Code Title 7 Chapter 32.46**

1. In November of 2020, Plaintiff Moates bought a phone from AT&T due to a promotion they were having where if you turn in an old phone that meets the requirements, they will credit you each month for the life of the contract. The amount of the cost of the new iPhone 12 mini was the same as the trade in value. The purpose of the offer was that AT&T would make money by extending the service contract.

2. The law states, "A person commits an offense if, with intent to defraud or harm any person, he, by deception: (1) causes another to sign or execute any document affecting property or service or the pecuniary interest of any person"



3. AT&T failed to hold up their end of the contract. They did not credit and continued to charge the Moates until July of 2021 when he noticed. This was unfortunately not the first time.[33]

4. AT&T accepted responsibility in an email to Moates dated 17 July 2021 saying they "sorry this happened."

**B. Fraud – Violation of Penal Code Title 7 Chapter 32.32**

1. In November of 2020, Plaintiff Moates bought a phone from AT&T due to a promotion they were having where if you turn in an old phone that meets the requirements, they will credit you each month for the life of the contract. The amount of the cost of the new iPhone 12 mini was the same as the trade in value. They intended to obtain property under fraudulent circumstances.

2. The law states, "A person commits an offense if, with intent to defraud or harm any person, he, by deception: (1) causes another to sign or execute any document affecting property or service or the pecuniary interest of any person"

3. AT&T failed to hold up their end of the contract. They did not credit and continued to charge the Moates until July of 2021 when he noticed.

4. AT&T accepted responsibility in an email to Moates dated 17 July 2021 saying they "sorry this happened."

**<u>CAUSES OF ACTION FOR BOTH DEFENDANTS</u>**

**A. Civil Conspiracy – Count One**

1. All previous allegations are incorporate herein by reference.

2. Facebook and AT&T engaged in unlawful sharing of confidential information about the Plaintiff without consent[34].

---

[33] https://www.fiercewireless.com/operators/at-t-to-pay-1-5m-to-settle-d-c-lawsuit-for-overcharging-mobile-service
[34] https://www.theverge.com/2018/7/2/17526716/facebook-cambridge-analytica-apple-microsoft-data-sharing

**B. Civil Conspiracy – Count Two**

1. All previous allegations are incorporate herein by reference.

2. Facebook shared private information with AT&T without consent for the purposes of advertising.

3. Facebook engages in targeting of individuals by different categories. So, when AT&T for example creates an ad that only targets someone with anxiety, Facebook only targets people who are likely to have anxiety thereby suggesting to AT&T they have anxiety.

4. Furthermore, by saying that someone has something that they may not have, Facebook in engaging in libel per quod.

**C. Civil Conspiracy – Count Three**

1. Defendant Facebook tracked Plaintiff Moates via web browsing history and location.

2. Defendants together than used that information to serve ads. For example, Moates goes to an AT&T store and then three days later AT&T is targeting him with ads based on Facebooks location history or browser history.

3. AT&T sold that location data to 3rd Parties[35].

**D. Civil Conspiracy – Count Four**

1. Defendant Facebook created Pixels which tracked Moates without consent on 3rd party websites[36].

2. AT&T installed pixels on their website and used that information to track Moates without consent. See Exhibit U.

---

[35] https://www.washingtonpost.com/technology/2019/01/10/phone-companies-are-selling-your-location-data-now-some-lawmakers-want-federal-investigation/
[36] https://www.facebook.com/business/learn/facebook-ads-pixel

**E. Data Theft - Violation of Penal Code Title 7 Chapter 33.02 Breach of Computer Security**

**Count 1**

1. Facebook and AT&T violated the law which states "A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."

2. Both AT&T and Facebook profited from the pixel arrangement.

3. They both accessed data they did not have consent to.

4. Facebook tracked user phone records[37] that AT&T had a duty to protect.

### IV. INJUCTIVE RELIEF

1. Plaintiffs request the court enter a permanent injunction requiring the Defendant to:

    a. Reactivate the accounts;

    b. Provide the Plaintiffs with the data from the accounts;

    c. Reactivate the software on the Oculus devices;

### XI. DAMAGES AND PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff Michael Moates asks the court to issue a citation for each Defendants to appear and answer, and that Plaintiff be awarded a judgement against Defendants for the following:

    a) Nominal damages;

    b) General damages;

    c) Actual damages;

    d) Special damages;

    e) Exemplary damages;

---

[37] https://arstechnica.com/information-technology/2018/03/facebook-scraped-call-text-message-data-for-years-from-android-phones/

f) Pre and post judgement interest;

g) compensatory damages;

h) injunctive relief stated above.

Respectfully Submitted,

/s/ Michael S. Moates

Michael Moates, Pro Se

Michaelsmoates@gmail.com

817-999-7534

2700 Colorado Boulevard #1526

Denton, TX 76210

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies Facebook approved electronic service in this case via W. Hamilton Jordan, counsel for Facebook. They were notified in advance of this amended pleading.

His email is: wjordan@keker.com

A cc request copy should be sent to Chris Kearney at ckearney@keker.com

As soon as a copy is uploaded by the clerk, they will be sent a copy via email.

Furthermore, Attorneys for AT&T have not yet appeared, but the Plaintiff has requested the court serve this pleading to them via certified mail return receipt.



**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 56532987
Status as of 8/23/2021 9:20 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Moates | | michaelsmoates@gmail.com | 8/21/2021 11:09:04 PM | SENT |
| Michael Moates | | michaelsmoates@gmail.com | 8/21/2021 11:09:04 PM | SENT |

CERTIFIED A TRUE AND CORRECT COPY
OF THE RECORD ON FILE IN MY OFFICE
DAVID TRANTHAM
DENTON COUNTY DISTRICT CLERK
By: Deputy Clerk
Date